Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

(1) MISTY RALEY, Individually, )
and (2) Misty Raley, as Parent )
and Next Friend of C.G., W.G., )
and C.G., minor children,      )
                               )
              Plaintiffs,      )
                               )
     v.                        )   No. CV5:08-cv-00376
                               )
(1) HYUNDAI MOTOR COMPANY,     )
LTD., a Korean corporation; and)
(2) HYUNDAI MOTOR AMERICA, a   )
California corporation,        )
                               )
              Defendants.      )
_____)

DEPOSITION OF CHARLES P. DICKERSON

Phoenix, Arizona
November 13, 2009
9:40 a.m.

Prepared by:
Janet Hauck, RPR
Arizona Certified
Reporter Number 50522

EXHIBIT 7

Raley v. Hyundai Motor Company
Deposition of Charles P. Dickerson - 11/13/2009

Page 2

```
              INDEX

WITNESS                              PAGE
CHARLES P. DICKERSON
    Examination By Mr. Teague:        4
    Examination By Mr. Cox:          98

              EXHIBITS

EXHIBIT      DESCRIPTION             PAGE

   1    Letter from Charles Dickerson to    6
        John Merritt, 8/9/07, with attachment
   2    Letter from Charles Dickerson to    7
        John Merritt, 8/28/07, with attachment
   3    Letter from Charles Dickerson to    7
        John Merritt, 9/11/07
   4    Letter from Charles Dickerson to    7
        John Merritt, 9/2/09, with attachment
   5    Letter from Charles Dickerson to    7
        John Merritt, 9/14/09
   6    Speed Calculation Case 3708         9
   7    Reconstruction and Analysis of     12
        Steering-induced, On-road, Untripped SUV
        Rollover Tests
   8    Germane Deposition Notes          88
   9    Drawing of Charles Dickerson's Opinion  88
        of Path of Vehicle in Rest Position
  10    Photographs of Vehicle            15
  11    Accident Reconstruction Animation CD  100
  12    File of Charles Dickerson        101
```

Page 3

   DEPOSITION OF CHARLES P. DICKERSON
was taken on November 13, 2009, commencing at 9:40 a.m.,
at the offices of Legal Video Specialists, 3033 North
Central Avenue, Suite 100, Phoenix, Arizona, before
JANET HAUCK, RPR, a Certified Reporter, Certificate
No. 50522, for the State of Arizona.

APPEARANCES:
For the Plaintiffs (by teleconference):
    MERRITT & ASSOCIATES, INC.
    Mark A. Cox
    917 North Robinson
    Oklahoma City, Oklahoma  73101
    1 (800) 690-2277
    mark.cox@merrittfirm.com

For the Defendants (by teleconference):
    JENNINGS, COOK & TEAGUE
    J. Derrick Teague
    204 North Robinson, Suite 1000
    Oklahoma City, Oklahoma  73102
    (405) 609-6000 (405) 609-6501
    vlp@jchlaw.com

Page 4

           CHARLES P. DICKERSON,
called as a witness herein having been first duly sworn
by the Certified Reporter to tell the whole truth and
nothing but the truth, was examined and testified as
follows:

              EXAMINATION
BY MR. TEAGUE:
    Q.  Mr. Dickerson, my name is Derrick Teague. I
represent Hyundai in this matter. I understand you've
done some additional work and you've done some
additional reports since your last deposition; is that
correct?
    A.  That's correct.
    Q.  Can you tell me -- so that I make sure that
I'm oriented to what is new. Your last deposition was
September 29th, 2006; is that right?
    A.  That sounds correct.
    Q.  Okay.  Since then --
    A.  Hang on, let me -- yes, that's correct. No.
Hold on.
    Q.  No, that's --
    A.  That's incorrect. My last deposition was
June 13th, 2007.
    Q.  Correct.

Page 5

    A.  Can you hear me all right?
    Q.  All right.  Yes, sir.
    A.  Okay.
    Q.  All right.  Since that deposition, I have a
report dated August 9th, 2007, a report dated
September 11th, 2007, a report dated September 2nd,
2009, and then one dated September 14th, 2009.  Are
there any other reports?
    A.  There should be an August 28th, 2007.
    Q.  August 28th, 2007.  Okay.  Let me start going
through those.  We'll identify it.
    A.  There would have been a copy of that in my
file if you don't have one in yours.
    Q.  All right, sir.  Thank you.  Just in brief
tell me what the August 27 -- or 28th, 2007 report deals
with.
    A.  As part of generating the motion files for
the animation, I refined my analysis a little bit, and
that's what that report was.
        MR. COX:  It's about ten pages down from
the top of his file.
        THE WITNESS:  The top section in what I
sent you is a complete set of what I have as my reports
in this file.
    Q.  BY MR. TEAGUE:  All right.  Give me a second.

GLENNIE REPORTING SERVICES
(602) 266-6535

Raley v. Hyundai Motor Company
Deposition of Charles P. Dickerson - 11/13/2009

Page 6

1  because I don't know that I've seen that one. Are you
2  -- let's -- have any of these -- have any of these
3  reports been marked as exhibits previously? They have
4  not; have they?
5      A.  I don't know.
6      Q.  Well, let's -- let's start with your
7  August 9th, 2007 report and mark it as Exhibit 1.
8          (Exhibit No. 1 was marked.)
9      Q.  BY MR. TEAGUE: Did that report have with it
10 some diagrams?
11     A.  Yes, sir, it did. It had one diagram.
12     Q.  All right. So, your August 9th, '07 report
13 is a total of three pages?
14     A.  Yes, sir.
15     Q.  All right.
16     A.  Hold on. There were -- I'm sorry. There
17 were two diagrams.
18     Q.  Okay. So, it's a total of four pages?
19     A.  Yes, sir, a total of four pages.
20     Q.  Your September 11th, 2000 report, let's mark
21 it as Number 2.
22         MR. COX: If you want to go in order, the
23 August 28th is next.
24         MR. TEAGUE: Oh, yes. Let's do the
25 August 28 one Exhibit --

Page 7

1      Q.  BY MR. TEAGUE: How many pages is your August
2  28th report?
3      A.  Four pages.
4          (Exhibit No. 2 was marked.)
5          (Exhibit No. 3 was marked.)
6      Q.  BY MR. TEAGUE: September 11th, '07,
7  Number 3, was it two pages, sir?
8      A.  Yes, sir.
9      Q.  The September 2nd, 2009, is that the next
10 report in order?
11     A.  Yes, sir.
12     Q.  We'll mark it 4.
13     A.  And it's three pages.
14         (Exhibit No. 4 was marked.)
15         THE WITNESS: I'm sorry. I can't count
16 today. It's four pages.
17     Q.  BY MR. TEAGUE: The last one, I believe, is
18 September 14th, 2009?
19     A.  Yes, sir.
20     Q.  And that would be Number 5.
21     A.  It's one page, Number 5.
22         (Exhibit No. 5 was marked.)
23     Q.  BY MR. TEAGUE: Are all of those -- are all
24 of those the reports that you created since your last
25 deposition?

Page 8

1      A.  Yes, sir.
2      Q.  Have you created any other documents,
3  diagrams, anything of that nature, other than what we've
4  gone through here in 1 through 5?
5      A.  Yes, sir, I have.
6      Q.  What else would there be?
7      A.  If you were to go to -- I have it marked as
8  Tab Number 3. So, I'd be I think the fourth section of
9  that stack of documents you have. It starts out first
10 page as Speed Calculation at the top. That is or
11 comprises -- that section comprises my calculations that
12 I use to generate the motion file or key frames for the
13 animation. If you get into photographs, you've gone too
14 far.
15     Q.  All right. It's speed calculations case
16 3708.
17     A.  Yes, sir, that -- that whole section.
18     Q.  This entire section is new -- new work
19 product of yours?
20     A.  Yes, sir, it is.
21     Q.  Including the photographs?
22     A.  There shouldn't be any photographs in that
23 section.
24     Q.  Okay.
25     A.  Well, I'm sorry. There -- there are two

Page 9

1  screen captures. They would look like photographs.
2  Yes, those are included. Those are screen captures
3  provided me by the animator.
4      Q.  Is the last page of that section, does it
5  have a calculation of T equals 150 equals 1/2 AT
6  squared; is that the last page of that section?
7      A.  Yes, sir.
8          MR. TEAGUE: Okay. So, let's mark that
9  as Exhibit Number 6.
10         (Exhibit No. 6 was marked.)
11         THE WITNESS: Do you want to number the
12 pages in it?
13     Q.  BY MR. TEAGUE: Well, if we numbered them, it
14 would assume that your order is the same order as mine.
15     A.  Right.
16     Q.  So, let's -- we can hold off on that for the
17 moment. How many total pages are there?
18     A.  I'm going to guess there's 15 or 20. I
19 haven't counted them. I count 22. The first
20 admonishment is not to guess.
21     Q.  That's what I counted, as well.
22     A.  Okay. And I'm sorry. That's Exhibit 6?
23     Q.  Yes, sir.
24     A.  I'm going place the exhibit number on the
25 page that says, "Speed Calculation 3708," which was the

GLENNIE REPORTING SERVICES
(602) 266-6535

Raley v. Hyundai Motor Company
Deposition of Charles P. Dickerson - 11/13/2009

Page 10

1  top page on mine.
2  Q. Yes, sir.
3  A. There are probably a few other things that
4  are new to my file since my last deposition.
5  Q. All right. What else?
6  A. Do we want to just go through and kind of
7  make a catalog?
8  Q. Yeah. I'm -- I'm -- I wasn't familiar with
9  Exhibit 6. And so, if you can go through the remainder
10 of the materials and tell me what's new since your last
11 deposition, I can determine whether I've seen that
12 before or not.
13 A. In what is my Section 6, I've included a copy
14 of a publication done by Lawrence Wilson and Michael
15 Gilbert. And that's the document that's referred to in
16 my August 28th report. That would not have been in
17 there prior. I also, since then --
18 Q. Let me find that one.
19 A. All right.
20 Q. My sections aren't numbered, so I have to --
21 A. Right, I'm sorry. I should have done that
22 when I produced it. It would have made this easier. It
23 would be the eighth one down. It's the only section
24 that has anything that looks like publications,
25 literature. Starts out with some handwritten notes at

Page 11

1  the top.
2  Q. At the top it says, "Roll Distance."
3  A. Literature review, yes, sir, that's the
4  section. The first -- first article in there is
5  actually Exhibit 21 from my October 5th deposition.
6  Q. Okay.
7  A. And then behind that one is this new paper.
8  Q. Analyzing the Trip Phase of Soft Soil
9  Rollovers?
10 A. No, the next one. Reconstruction Analysis of
11 Steering Induced On Road.
12 Q. This one?
13 A. Yes, sir. That's the last page. So, it's
14 the documents before that or the pages before that.
15 Q. So, is this whole section here new work, as
16 well?
17 A. No. I think -- I think except for the review
18 of that last paper, I did that work prior to my last
19 deposition. I know I reviewed the 980022 paper because
20 it has a deposition exhibit attached to it.
21 Q. Yes, sir, I recall seeing that. Had you --
22 these documents here, the start of this section that you
23 have roll distance, had those -- had those notes been
24 prepared?
25 A. I thought they had, but I am not sure. The

Page 12

1  bottom note where I just -- at the very bottom where you
2  can see it's a little different writing, I'm using a
3  different pencil. Underneath the line on that page I
4  know I added since then, because at the last deposition
5  I hadn't read that paper.
6  Q. Okay. And that's referring to the article of
7  Reconstruction and Analysis of Steering-Induced,
8  On-Road, Untripped SUV; is that right?
9  A. Yes, sir.
10 Q. Is that right?
11 A. Yes, sir.
12 Q. Why don't we mark that Number 7.
13 A. The paper?
14 Q. Yes. That's the only new material; isn't it?
15 A. Yes, sir. Okay. I've got it marked as
16 Number 7.
17        (Exhibit No. 7 was marked.)
18 Q. BY MR. TEAGUE: Is there anything else that's
19 new or in addition to --
20 A. Well, since that time, I have reviewed
21 Dr. Germane's deposition and his file. I don't recall
22 if I did that before. I don't believe so. His
23 deposition was on July 9th of '07. Yeah. So, I would
24 have reviewed that after my last deposition.
25 Q. All right.

Page 13

1  A. That's a whole section, my Section 10.
2  Q. Do you have any notes or anything like that,
3  or is that just his copy of his deposition?
4  A. It has my notes. I have several pages of
5  handwritten notes and then copies of materials from his
6  file. Actually, the next two sections are new, because
7  I also have a copy of his most recent report,
8  September 30th, 2009.
9  Q. The first section -- well, let me stop and
10 check. The notes that you have with respect to
11 Dr. Germane, do those have any of your opinions in them,
12 or are you just taking notes on what his deposition
13 testimony is?
14 A. These are just notes on what his testimony
15 was.
16 Q. Do your notes contain any criticisms or
17 things of that nature with respect to his testimony?
18 A. Not in those notes, no, sir.
19 Q. Okay. Do you have notes somewhere where
20 you've analyzed his opinion at his deposition?
21 A. I don't believe I have -- I don't have
22 anything written down. I have his materials. Then I
23 have a drawing where I have put some of his measurements
24 into my drawing. That's the very top of the next
25 section. No. Keep going. That's -- that's one of his

## Page 14

1 exhibits. Yes, sir, that's it.
2    Q.  Would this be Number 8 if we marked the
3 drawing?
4    A.  Yes, sir, it would be.
5        MR. COX:  Did you mark Germane's depo
6 notes that he made?
7        MR. TEAGUE:  No, I didn't.  Do you want
8 me to?
9        MR. COX:  If you want.
10       MR. TEAGUE:  I'll be happy to.  No, I
11 didn't mark the notes.
12   Q.  BY MR. TEAGUE:  Why don't we mark the
13 notes -- German deposition notes.  Let's mark it
14 Number 8.
15   A.  Do you want that as 8?
16   Q.  Yeah.  And then we'll mark the drawing that
17 you referenced as Number 9.
18   A.  I took some photographs of the undercarriage
19 of this vehicle that are -- a portion of which are
20 contained in one of the September reports, one of the
21 newer reports.
22   Q.  Yes, sir.
23   A.  Those are included in yours, and they're at
24 the back of my photographs in my Section 4.  You'll know
25 they're -- they're marked underneath two to a page as

## Page 15

1 3708 undercarriage in the photos 1 through 25.  My
2 original set of photographs is marked as Exhibit 19 in
3 my December 5, '06 deposition.
4    Q.  This is your Section 4?
5    A.  Yes, sir.
6    Q.  These photographs?
7    A.  Yes, sir.  Those are them.
8    Q.  And these are new photographs of the
9 undercarriage since your last deposition?
10   A.  Yes, sir.
11   Q.  What number are we on now?  10?
12   A.  I have 10.
13       MR. TEAGUE:  Let's mark those
14 photographs -- there's 25 of them -- Exhibit Number 10.
15       (Exhibit No. 10 was marked.)
16       THE WITNESS:  I guess the last -- there
17 are some other materials that are new since then that
18 are not included in this notebook.
19   Q.  BY MR. TEAGUE:  Do you have other materials
20 with you that aren't in the materials that I have here?
21   A.  No.  You have -- well, I do.
22   Q.  Oh.
23   A.  I have four depositions that are not included
24 in those materials.
25   Q.  Okay.  What four depositions are they?

## Page 16

1    A.  I have these four depositions.  One is of
2 Jack Gill, Casey Garza, Chelsea Garza and Wesley Garza.
3 And I -- I supplied the cover page.  I didn't copy the
4 whole thing.  I do have Misty Raley's deposition, but I
5 didn't think you guys needed another copy of it in the
6 file.
7    Q.  Are you saying that the front cover page of
8 those depositions are included in here?
9    A.  No, sir.  I just received these depositions
10 last night.
11   Q.  Have you reviewed those depositions?
12   A.  Yes, sir, I have.
13   Q.  And who is Jack Gill?
14   A.  Jack Gill is a stunt driver, a professional
15 driver that Mr. Merritt hired to do some testing.
16   Q.  And what exactly do you have -- do you have a
17 deposition of him?
18   A.  I have a deposition, and I have DVDs of his
19 work of the testing that he did.
20   Q.  Okay.  What deposition -- is that a
21 deposition in this case?
22   A.  Yes, sir.
23   Q.  Okay.  What's the date on it?
24   A.  August 30th, 2007.
25   Q.  Have you read those materials and reviewed

## Page 17

1 them?
2    A.  Yes, sir, I have.
3    Q.  Have you read the -- did you say Casey,
4 Chelsea and Wesley Garza?
5    A.  Yes, sir.
6    Q.  Have you read those depositions?
7    A.  Yes, sir, I have.
8    Q.  All right.
9    A.  At the back of your data set there, I made
10 photocopies of the CDs and DVDs that I have in this
11 file, some of which are new since my last deposition.
12   Q.  What section is that, sir?
13   A.  The very last or the second to last.  The
14 very last, I think, is a large drawing.  Should have
15 been a drawing, a folded drawing in there someplace
16 either at the top or the bottom.  That's it.
17   Q.  Is this new?  Is this a new drawing or is
18 this --
19   A.  Yes, it is.  That's an enlargement of the
20 drawing that is part of that August 28th, '07 report.
21   Q.  Are there any DVDs -- I'm looking at the
22 copies of the DVDs that you have.
23   A.  Yes, sir.
24   Q.  Are there DVDs or discs here that you have
25 information that you had not seen or -- prior to your

Page 18

1 last deposition?
2   A. Yes, sir.
3   Q. Can you tell me which ones those are?
4   A. Those are the ones that describe the testing.
5 There's two sets of tests. One is a drop test, both
6 with an OEM and then a modified vehicle, and then
7 another set is a rollover drop test, the JRS test. I
8 had not seen those.
9   Q. I see the JRS -- I'm sorry. Go ahead.
10  A. Then -- I'm sorry. The bumper strike test
11 with Jack Gill, I had not seen those. The rest I had
12 seen. Well, that's not true. There's also that I had
13 not seen the video of Dr. Germane's deposition.
14  Q. All right. I found one of the -- one of the
15 CDs that you were referring to that you had not seen
16 before, but I'm not sure that I've identified the others
17 here. Photographs of the rear bumper of the exemplar;
18 had you seen that?
19  A. I'm sorry. That was broken up.
20  Q. Photographs of the rear bumper of the
21 exemplar '99 Hyundai Sonata; had you seen that?
22  A. Yes, sir -- no. I don't think I'd seen that
23 before my last one. Hang on. Let me find that one.
24  Q. Why don't -- I guess let's try to cut down on
25 going through all on them.

Page 19

1   A. Sure, I understand.
2   Q. But whatever is the easiest way -- whatever
3 is the easiest way for you to tell me what you had not
4 seen before.
5   A. All right. I unfortunately don't have these
6 in the same order that you're looking at them. I had
7 not seen any of the testing. So, any of them that
8 described testing -- there are three tests in there.
9 There's two drop tests. There's two that are JRS tests,
10 and then -- I think it's a three-disc set. Hang on and
11 I'll make sure I've got that correct. And then there's
12 one, two, three discs that are part of the testing done
13 by Jack Gill. I also had not seen the deposition of
14 Dr. Germane or his file materials. I think that's it.
15  Q. All right. Any other new materials?
16  A. No, sir.
17  Q. That's a fair amount of new stuff. So, we
18 may have to take longer than I planned.
19  A. Okay.
20  Q. But as I read in one of your reports, I
21 believe -- let me find it so I read it correctly. You
22 had stated that you had returned to your original
23 opinions that you gave in your first deposition. I
24 think that's your August 9th, '07 report which would be
25 Exhibit 1.

Page 20

1   A. Yes, sir.
2   Q. Is that -- is that the case, as we sit here
3 today, that you have returned to your opinions of your
4 original testimony in your first deposition?
5   A. Fundamentally, that's true, but I have
6 refined them through the work I did to generate the
7 animation. So, really, the final opinions are in the
8 August 28th report which includes a slight change in the
9 path and then some slight changes in the speeds to
10 reflect that path. And then as part of the animation
11 work I generated some roll rate calculations that I had
12 not done before. So, those are additional opinions.
13  Q. So, your refined or new opinions, are all of
14 those expressed in Exhibit Number 2?
15  A. Yes, sir.
16  Q. That's the one I have not seen before, so
17 give me a minute to go through that.
18  A. Certainly.
19  Q. Have you -- you've told me what additional
20 documents you reviewed. Have you interviewed or spoken
21 to anyone to help you refine or provide your final
22 opinions such as the highway patrolman or any witnesses
23 or other experts?
24  A. As part of generating the animation, of
25 course, I had quite a few conversations with Mr. Brad

Page 21

1 Matheson.
2   Q. Besides Matheson, anyone else?
3   A. But besides him, no, sir, I have not. And I
4 have not talked to any witnesses, and I haven't talked
5 to the police officer since the day I spent with him
6 before my deposition.
7   Q. I'm sorry. I cut you off. I apologize.
8   A. That's okay.
9   Q. Have you been back to the accident scene?
10  A. No, sir.
11  Q. You have inspected the vehicle again?
12  A. I have, yes, sir.
13  Q. How many times since your last deposition?
14  A. I think I've seen it twice since my last
15 deposition.
16  Q. Why were you inspecting the vehicle again
17 after your -- you had previously inspected it; hadn't
18 you?
19  A. Oh, absolutely. It may have been just -- it
20 may have been just once. I don't recall specifically
21 what dates I was there, but once or twice.
22  Q. Okay. Once or twice, whatever the number is,
23 what was the purpose of the additional inspections?
24  A. The purpose was to look at the underside of
25 the vehicles more closely.

### Page 22

1  Q. And what were you looking for?
2  A. Looking for evidence of ground contact during
3  the rollover.
4  Q. And I think in one of your reports you have
5  some photographs you talk about ground contact, correct?
6  A. That's correct, yes, sir.
7  Q. All right. Did those inspections or the
8  finding of ground contact provide the basis of any
9  opinion?
10 A. The opinion that there was some ground
11 contact, yes, sir. That's in my -- whatever opinion is
12 included in that report. If you will hold on a minute,
13 I can be a little more specific. The report of
14 September 2nd, 2009, Exhibit Number 4, is the result of
15 that inspection or inspections.
16 Q. All right.
17 A. And just to be correct, I did do two
18 inspections. There was one on August 31st, 2007, and
19 one on October 28th, 2008.
20 Q. I wanted to ask you to clarify something for
21 me in reading your prior deposition so that I understand
22 what we're talking about here today. There was a
23 calculation or measurement done by the trooper, one of
24 them which was I think 180 feet. Do you recall that
25 number?

### Page 23

1  A. Yes, sir.
2  Q. And was that from the edge of the roadway to
3  the general area of the point of rest of the vehicle; is
4  that correct?
5  A. It's a little more specific than that. The
6  trooper was very clear in my conversation with him that
7  he measured from the stripe at the edge of the roadway
8  along the path to the vehicle to be 180 feet.
9  Q. You've done some roll rate calculations now?
10 A. Yes, sir.
11 Q. All right. And we'll get to those in your
12 Exhibit 2, right?
13 A. Yes, sir.
14 Q. All right. Looking at Exhibit Number 1, your
15 August 9th, '07 report, you learned that Lee DeChant's
16 photogrammetry was apparently in error; is that correct?
17 A. That is correct.
18 Q. And as a result of the errors in his
19 photogrammetry, you reverted back to your opinions that
20 you originally expressed in your first deposition,
21 correct?
22 A. That's correct.
23 Q. All right. The speed calculations that you
24 gave at that time were what, sir. Approximately --
25 A. Hold on. I just -- I hadn't looked at it in

### Page 24

1  a while. The beginning of the rollover was 25 to 29,
2  and at the edge of the roadway was 46 to 53 miles per
3  hour.
4  Q. Are those the same speed calculations that
5  you have today?
6  A. No, sir.
7  Q. What are your new speed calculations?
8  A. At the beginning -- oh, I'm sorry. I thought
9  you were through with the question.
10 Q. Just go ahead and tell me what your speed
11 calculations are.
12 A. Okay. At the beginning of the rollover, the
13 Raley vehicle was traveling between 21 and 25 miles per
14 hour. And at the edge of the road it was between 45 and
15 53.
16 Q. So, the speed at the edge of the roadway is
17 essentially the same as your original opinion?
18 A. Roughly, yes, sir.
19 Q. And the speed, when the vehicle first begins
20 to roll on the grass, is now 21 to 25 miles per hour?
21 A. Yes, sir.
22 Q. So, you've reduced the speed as the vehicle
23 began to roll in the grass; is that right?
24 A. That's correct.
25 Q. And why did you do that?

### Page 25

1  A. When we were working on the animation, it
2  became clear that the vehicle began to roll farther down
3  the hill than I originally opined. So, I moved the trip
4  points down the hill slightly about 10 feet. And that
5  shortened the roll distance and reduced the speed at
6  trip.
7  Q. So, your trip point is 10 feet further down
8  the hill than it was previously?
9  A. Yes, sir.
10 Q. And what is the basis for your belief that
11 the trip point was somewhere different than your
12 original opinion?
13 A. When we were doing the animation, as the
14 process evolves, we have a three-dimensional scene. And
15 then we can place a camera down near the bottom of the
16 scene. And when we were watching the vehicle as it went
17 through the motions that I had originally calculated,
18 which was with my original trip point, it seemed clear
19 by looking at it that I had it rolling too soon, too far
20 up the side of the hill.
21 Q. When you said you can place a camera, a
22 camera where at, sir?
23 A. We placed a camera probably down in the
24 region where the -- on the ground in the region where
25 the police officer's car was. I don't recall

Page 26

1  specifically.
2  Q. Can you tell me as you sit here where you
3  believe the police officer's car was positioned?
4  A. No, sir, I can't. Not exactly.
5  Q. So, if you lowered -- you lowered the speed
6  of the -- at the trip point which reduced the distance
7  of roll which resulted in a different point of rest?
8  A. Same point of rest, a different place to
9  begin the roll.
10 Q. So, your point of rest that you're expressing
11 today is the same point of rest that you expressed in
12 your first deposition?
13 A. Correct, plus we moved the -- the
14 calculations that I've shown there are the calculations
15 for the animation. The point of rest for the final
16 version of the animation was moved another 10 feet,
17 because that fit best with the video matching of the --
18 or the three-dimensional matching of the scene photo
19 from the police vehicle with the animation.
20 Q. I apologize. Did you finish?
21 A. I did. Yes, sir. Go ahead.
22 Q. The animation as originally done didn't match
23 up, and so you had them revise the animation so it would
24 fit with your point of rest and trip point, right?
25     MR. COX: Object to the form.

Page 27

1     THE WITNESS: That's not quite right. We
2  did the original animation, then Mr. Matheson did some
3  work where he's trying to figure out where the rest
4  position was from the police photographs. And then in
5  doing so, he found the rest position that fit the
6  photographs was about 10 feet from where I had opined
7  that it was. And I had him move the animation to that
8  point. The 10 feet is well within the resolution of
9  what we know about the rest position in this case. So,
10 I didn't recalculate everything. I just had to move the
11 animation a little bit.
12 Q. BY MR. TEAGUE: So, did Mr. Matheson do some
13 photogrammetry?
14 A. He did some sort of alignments of the
15 photograph with the scene information. I don't know
16 if that's -- I don't really know if he wants to call it
17 photogrammetry. I know that he's going to talk about
18 that.
19 Q. Sure. And when you say, "photographs,"
20 you're talking about a scene from the trooper's auto
21 cam?
22 A. Yes, sir.
23 Q. All right. In your Exhibit 1 you also talk
24 about the -- you've changed the path of travel of the
25 Raley vehicle from your original opinion; is that right?

Page 28

1  A. Yes, sir.
2  Q. And why did you do that?
3  A. When I reviewed the original, I don't recall
4  if I didn't have the barrel data or I made a mistake,
5  but in my original path, the Raley vehicle would have
6  clipped the barrels as it headed off the edge of the
7  road. So, I moved the path slightly so that it wouldn't
8  clip the barrel since it's clear that it didn't.
9  Q. Now, how did you determine that the path of
10 travel in your first reconstruction that the vehicle
11 would have hit those barrels at the northern end of the
12 road?
13 A. I had some more information from between my
14 first reconstruction and the DeChant stuff about where
15 the barrels were. I don't recall where I got that. I
16 may have gotten that off of an aerial photo.
17 Q. Are you saying you had more information about
18 the exact location of the barrels?
19 A. Yes, sir.
20 Q. And so, based on that information, you
21 concluded that the barrels were in a position such that
22 your first reconstruction was inaccurate?
23 A. Concerning the path next to the barrels, yes,
24 sir.
25 Q. All right. But you can't tell me where you

Page 29

1  got the new information?
2  A. No, sir, I don't -- I don't recall. It may
3  not have been new information. It's an error that I
4  found and I took that opportunity to correct it.
5  Q. So, the path of travel of the vehicle is now
6  different from your original position?
7  A. Slightly, yes, sir.
8  Q. And the speed of the vehicle, up to the point
9  of the roadway edge, is essentially the same as your
10 first opinion?
11 A. Yes, sir.
12 Q. The speed at the point that it trips is
13 lower, correct?
14 A. Correct.
15 Q. By about five miles an hour?
16 A. Four or five. Four or five.
17 Q. And the actual point of where the vehicle
18 began to trip and roll is 10 feet further down the
19 slope?
20 A. Yes, sir.
21 Q. The animation that was created, what was that
22 based off of?
23 A. It's based on my reconstruction. I should
24 say the motion of the car and the path of the car is
25 based on my reconstruction.

Page 34

1  feet, and that's the direction.
2      Q.   All right. So, where you show the vehicle in
3  this particular drawing which is page 4 of Exhibit 2, is
4  that the point of rest, or does it need to be extended
5  10 feet further on the drawing?
6      A.   My opinion about the point of rest would be
7  it's somewhere between where I have it on this drawing
8  and 10 feet beyond that.
9      Q.   Okay. So, if I understand correctly, the
10 vehicle traveled or came to a point of rest 10 feet
11 further along its path in which you had originally
12 reconstructed?
13     A.   Well, it came to rest somewhere in that area.
14 So, the drawing you have in front of you is one end of
15 its rest area, and the animation really shows the other
16 end.
17     Q.   All right. Looking at -- looking at
18 Exhibit 2, your August 28th, '07 report.
19     A.   Yes, sir.
20     Q.   Here you say you've refined your
21 reconstruction and made some modifications to your
22 original opinions. They are as follows: Number 1, the
23 distance from the beginning of the roll to the point of
24 rest, 50 feet.
25     A.   Yes, sir.

Page 35

1      Q.   Is that correct?
2      A.   Correct.
3      Q.   What was -- what was the distance in your
4  first deposition from the beginning of the roll to the
5  point of rest?
6      A.   I think it was 60 feet.
7      Q.   And tell me what information you had that
8  caused you to reduce the distance of the roll.
9      A.   When I was working with the animator in our
10 three-dimensional scene, it appeared in viewing it that
11 the -- I had the vehicle rolling or beginning to roll
12 too far up the hill, meaning it wasn't to the bottom of
13 the hill yet when it began to roll at 60 feet.
14     Q.   So, you're saying that your original
15 reconstruction had it rolling further up the slope?
16 What's the significance of that?
17     A.   The significance is that when I did more
18 work, I was able to refine it. And through the more
19 work and working out specifically generating the details
20 that are required to generate the animation, I decided
21 that it was more accurate if the roll began a little
22 farther down the hill than I originally opined.
23     Q.   I'm trying to understand, if the three-
24 dimensional video is based on your reconstruction, how
25 does the animation itself tell you that your

Page 36

1  reconstruction is wrong?
2      A.   We have the video and the testimony from the
3  police officer. We generate an animation, and then when
4  I view the animation, I look back and watch the
5  animation and say, "I have it rolling too far up the
6  hill." It's an opportunity to visualize the three-
7  dimensional nature of the rollover. So, it's more
8  accurate -- and you're out of the video screen, so --
9      Q.   I'm sorry.
10     A.   That's quite all right.
11     Q.   Go ahead.
12     A.   So, the -- as part of the process of
13 generating the detail for the animation, I decided that
14 it's more correct. It's better if I have it rolling a
15 little farther down the hill, having it start rolling a
16 little farther down the hill.
17     Q.   All right. Tell me, though, if the three-
18 dimensional video is based on your original
19 reconstruction, how does viewing your original
20 reconstruction in three-dimension tell you that your
21 point of trip is somehow inaccurate?
22     A.   If you were standing on the ground out there,
23 and we brought a car in and drove it through the scene
24 and rolled it down the side of the hill and videotaped
25 it, you would look at it and say, "Wow, it should have

Page 37

1  started rolling a little farther down the hill."
2  Because it's not clear in the two-dimensional drawings
3  in the original reconstruction how far down the hill the
4  car was when it began to roll. It's hard to visualize.
5  So, as part of visualizing the reconstruction, I can see
6  that there's a place that I can improve it a little and
7  make it a little more accurate.
8      Q.   But you're not suggesting that that animation
9  is actually the dynamics of the vehicle at the time of
10 the accident; are you?
11     A.   I'm suggesting that it approximates the
12 dynamics of the vehicle at the time of the accident.
13 All the motion is physically correct. We don't know the
14 exact details of what happened out there.
15     Q.   I guess -- I guess I'm struggling with
16 understanding how one -- if the animation is based on
17 your reconstruction, how -- how your reconstruction
18 viewed in animation tells you your reconstruction is
19 wrong.
20         MR. COX:   Object to the form; asked and
21 answered.
22         THE WITNESS:   I'm trying to explain it in
23 a different way. The animation is physically correct.
24 The scene is based on three-dimensional measurements.
25 So, by looking at the scene, I get more information from

### Page 38

1  the animation. It's the same as if I went out and stood
2  out there and parked a car on the side of the hill and
3  said: Where do I think it started rolling based on what
4  we see in the police video, based on my reconstruction,
5  and based on the car parked there. It's more
6  information.
7      Q.  BY MR. TEAGUE: All right. Paragraph 2 in
8  Exhibit 2, that is the speed that you attribute to the
9  vehicle when it began rolling being 21 to 25 miles per
10 hour, correct?
11     A.  Correct.
12     Q.  And why is the speed reduced in your refined
13 opinions as opposed to being what it originally was?
14     A.  It's traveling a shorter distance while it
15 rolls. So, the speed at the beginning of the roll is
16 lower.
17     Q.  And that's based on the assumption that it
18 actually began to roll further down the slope than where
19 you originally opined?
20     A.  Yes, sir.
21     Q.  Paragraph 3, this is the speed of the vehicle
22 when it left the roadway at the edge of the road from
23 the fog line?
24     A.  Yes, sir.
25     Q.  That speed is the same as your original

### Page 39

1  opinion?
2      A.  It's close to the same. Let me check and
3  make sure it's exactly the same. It's a little bit
4  different. Originally, I said 46 to 53. This says 45
5  to 53.
6      Q.  All right. Is there any significance in the
7  one mile per hour?
8      A.  No, sir.
9      Q.  Why do you believe that the vehicle speed as
10 expressed in paragraph 2 there would it begin to roll
11 over -- I'll move back up. And I'm sorry.
12         Why do you believe it's at the lower
13 speed now than you originally --
14     A.  Because it's rolling a shorter distance.
15     Q.  And I asked you that. Is there anything
16 other than it's rolling a shorter distance?
17     A.  No, sir.
18     Q.  Okay. How do you know the exact distance
19 that it rolled?
20     A.  We don't know the exact distance that it
21 rolled.
22     Q.  So, you're just assuming that it rolled a
23 shorter distance?
24     A.  No. It fits the physical evidence. We know
25 that the vehicle began to roll at the bottom of the hill

### Page 40

1  or near the bottom of the hill. And we know about where
2  the vehicle came to rest based on -- primarily based on
3  the police officer's measurements, and then also based
4  on looking at the videotape images. So, from the bottom
5  of the hill where it starts to roll to where it came to
6  rest, the distance is approximately 50 feet.
7      Q.  What's the margin of error with respect to --
8  or whatever -- what's the terminology you used? You
9  said it was within the -- it was 10 feet within the
10 resolution of reconstruction? I would refer to that as
11 a margin of error; is that a fair statement?
12     A.  I would -- no. I think I would call it more
13 a region of confidence.
14     Q.  Okay. What -- what is the region of
15 confidence with respect to the variants on the point of
16 trip? How many feet further up the slope or further
17 down the slope do you think the -- that particular point
18 could vary?
19     A.  Probably could vary 5 or 10 feet.
20     Q.  Could it be 20 feet?
21     A.  Probably not.
22     Q.  15 feet?
23     A.  Don't know. Maybe 15, but probably not. 15
24 would be a significant difference. We'd probably be
25 able to tell that.

### Page 41

1      Q.  What about the degree of variance with
2  respect to the point of rest? How many feet could that
3  vary?
4      A.  Probably 10 feet.
5      Q.  Could it be 20 feet?
6      A.  Given the work we've done, I don't think so.
7  I don't think it could be that much.
8      Q.  Well, you know -- you know it's at least 30
9  feet based on what the trooper told you, right?
10     A.  It's at least what?
11     Q.  30 feet.
12     A.  30 feet what?
13     Q.  Well, the difference between what the trooper
14 told you and where you put the vehicle at the point of
15 impact or point of rest is somewhere between probably,
16 what, 5 and 30 feet?
17     A.  The trooper told me 180 feet, and I have it
18 between 180 and 190 feet.
19     Q.  But I'm talking about -- I'm not talking
20 about the 180 feet, sir. I'm talking about the general
21 area he described as the point of rest. Because you
22 don't know the exact location, true?
23     A.  No, we do not. We only have his measurement.
24     Q.  And his -- where he described for you when
25 you were at the scene is actually 30 feet further

Page 42

1  south/southwest than where you put the vehicle now,
2  right?
3    A.  That's true.
4    Q.  So, the variants based on the trooper and
5  your reconstruction is at least 30 feet, right?
6    A.  No, I don't think so.  He was working from
7  his memory, and he wasn't -- he wasn't using his
8  measurements.
9    Q.  But I'm talking about, based on the general
10 area he described for you, the point of rest is
11 somewhere at least within a 30 feet difference between
12 what he told you and what you have down as a
13 reconstruction.  Because where he told you was 30 feet
14 further south/southwest than where you place the vehicle
15 now, right?
16         MR. COX:  Object to the form.
17         THE WITNESS:  He told me it was -- I'm
18 having trouble with the 30 foot number, because I don't
19 remember what the specific is.  That sounds about right,
20 but -- yeah, when he was standing out there, he had it
21 south/southwest of where we were.
22   Q.  BY MR. TEAGUE:  All right.  Let's move to
23 paragraph 4, Exhibit 2, the roll rate.
24   A.  Yes, sir.
25   Q.  Why did you calculate a roll rate?

Page 43

1    A.  Well, you have to calculate a roll behavior
2  of the vehicle for the animation.  The roll rate is part
3  of that calculation.
4    Q.  You had not previously done that before?
5    A.  That's correct.
6    Q.  Why did you not do it before?
7    A.  I have not been asked to.
8    Q.  Were you asked to do a roll rate calculation
9  sometime after your first -- or second deposition?
10   A.  Yes, sir.
11   Q.  And what was the purpose for it?  Was there
12 any purpose for that besides the animation?
13   A.  Well, it comes out of the animation.  I was
14 asked to do the animation, so that would be the purpose.
15   Q.  Did Mr. Merritt ask you to do that?
16   A.  Yes, sir.
17   Q.  Do you remember what he -- specifically what
18 he asked you to do and why?
19   A.  He asked me to provide the information that
20 Mr. Matheson needed to produce an animation of this
21 crash.  The roll behavior is part of that calculation.
22   Q.  Tell me what factors or information you have
23 to have in order to calculate a roll rate.
24   A.  Primarily, you need to know speed, the
25 distance that it rolled and the number of rolls.

Page 44

1    Q.  Need to know the speed of vehicle at what
2  point in time?
3    A.  When it begins to roll.
4    Q.  All right.  And you need to know the distance
5  of the roll from the point it begins to the point of
6  rest?
7    A.  Yes, sir.
8    Q.  And do you need to know the number of rolls
9  in order to calculate the roll rate?
10   A.  Yes, sir.
11   Q.  Any other factors?
12   A.  It helps if you know points of contact along
13 the way so that you can orient the vehicle.  Those are
14 the -- those are the primary things you need to start to
15 estimate roll rate.  The more detail -- can I finish my
16 answer?
17   Q.  I apologize.  I thought you were done.
18   A.  That's okay.  I think there's a time lag
19 between us, too.  Primarily, you need what I listed.
20 You can provide more detail if you have more physical
21 evidence to work from.
22   Q.  Are the calculations of roll rate, are those
23 in Exhibit Number 6?
24   A.  Yes, sir.
25   Q.  And what was the roll rate that you

Page 45

1  determined for this vehicle?
2    A.  The average roll rate through the first roll
3  was about 310 degrees per second, and then through the
4  second roll it was a little slower.  Hang on.  I'll give
5  you the exact number.  The second roll was about 185
6  degrees per second.
7    Q.  In the report you have roll rate was between
8  185 and 310, and you're separating those out, now
9  telling me that 310 is for the first roll, 185 is for
10 the second roll?
11   A.  Yes, sir, through the -- through the
12 beginning of the roll it's a little higher than the end.
13   Q.  Have you done anything with respect to Misty
14 Raley, her body dynamics or when she was ejected or
15 anything like that?
16   A.  Our connection is breaking up.  I lost
17 everything after "Misty Raley."
18   Q.  Can you hear me now?
19   A.  Yeah, now I can hear you.
20   Q.  Have you done anything with respect to Misty
21 Raley's eject or evaluating when she was ejected?
22   A.  No, sir.  We're having trouble with our
23 connection.  My understanding is the question is:  Have
24 I done anything with the dynamics of Misty Raley and her
25 ejection?

### Page 66

1  Q. All right. Let's go to -- let me ask you
2  real quick. Exhibit Number 7 is an article that you had
3  not previously read when you gave your original opinions
4  in your first deposition; is that right?
5  A. That's correct.
6  Q. And you since have read it. Is there any
7  significance it to with respect to your opinions?
8  A. Yes, sir.
9  Q. Tell me what those are. What is significant
10 about this article as to what opinion?
11 A. I have the opinion that the vehicle rolls
12 over two times in approximately 50 feet. That article
13 shows the vehicle can roll over in 25 feet, complete a
14 revolution in 25 feet.
15 Q. I have not had an opportunity to review or
16 see this. So, if you would, tell me, is there more than
17 one vehicle tested in this article?
18 A. No, sir. It's a single test presented in
19 great detail.
20 Q. What type of vehicle was tested in this one
21 vehicle test?
22 A. Hang on. Let me find the article. It's an
23 SUV. I don't remember which one.
24 Q. The first page looks like it says a '91 Ford
25 Explorer XLT and a '97 Toyota Forerunner SR5. Are there

### Page 67

1  two vehicles that were tested?
2  A. I thought it was just one, but I haven't read
3  it in a long time. I'm going to have to look at the
4  report.
5  Q. Regardless of the number, they're both SUVs,
6  right?
7  A. Yes, sir.
8  Q. What were the surfaces upon which these tests
9  were conducted?
10 A. I believe they were done on asphalt.
11 Q. Do you know what speeds the vehicles were
12 traveling at the time of trip?
13 A. No, sir, not off the top of my head. I'd
14 have to look at the report. Here we go. There were two
15 tests. '91 Ford Explorer and '97 Toyota Forerunner.
16 Q. When did you acquire this article?
17 A. Sometime before that August 28th report.
18 It's Volume 2, issue 1 of Collision. They don't put a
19 date on their cover page.
20 Q. So, in terms of your opinions, this simply
21 supports your belief that the vehicle can complete two
22 revolutions -- or complete a revolution in 25 feet, and
23 clearly can complete 2 in 50 feet?
24 A. Yes, sir.
25     (Comments off the record.)

### Page 68

1  MR. TEAGUE: Let's take a break real
2  quick.
3     (Recess from 11:56 a.m. to 12:02 p.m.)
4  Q. BY MR. TEAGUE: Exhibit 6, does this contain
5  all the calculations that you've made in the case?
6  A. Yes, sir, it does.
7  Q. Originally, you had calculated two different
8  speeds. Now you have two speed calculations and a roll
9  rate. Are there other calculations that we haven't
10 talked about besides the distance of travel?
11 A. Well, I have calculated a range of speeds of
12 the trip, a range of speeds at the edge of the road.
13 And then I have calculated the position versus time and
14 roll angle versus time of the vehicle as well as the
15 position and roll angle versus displacement or distance.
16 And that's what these calculations are that make up the
17 rest of Exhibit 6.
18 Q. And the purpose of those calculations, was
19 that to provide to Matheson for the animation?
20 A. Yes, sir.
21 Q. Exhibit 5 is your September 14th, 2009
22 report. Did you actually meet with Mr. Matheson?
23 A. At any time or on -- in September?
24 Q. At any time.
25 A. At any time, yes, sir -- yes, sir, I did.

### Page 69

1  Q. When did you meet with him?
2  A. In August of '07, I went out to his facility
3  to work with him to produce the animation.
4  Q. When was the animation completed?
5  A. It was pretty much completed when I left at
6  the end of August. We fine-tuned it since then. So, it
7  wouldn't have been completed until after September 14th,
8  2009.
9  Q. Has it been -- except for moving the 10 feet
10 relocation, has it been modified farther since September
11 14th?
12 A. No, sir.
13 Q. All right. So, in August of '07, is it fair
14 to say that the animation was for the most part
15 completed then?
16 A. Yes, sir.
17 Q. Do you have copies of the animation at the
18 stage it was in August of '07?
19 A. No, sir. I don't think I kept any.
20 Q. How was it modified from August of '07 until
21 September of '09?
22 A. I think the only differences would be the
23 shifting at 10 feet that occurred that's discussed in
24 this letter. And I think that also the other
25 modification was that since I was there, Mr. Matheson