# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

MISTY RALEY, et al.,                    )
                                        )
                    Plaintiff,          )
vs.                                     )        NO.  CIV-08-0376-HE
                                        )
HYUNDAI MOTOR COMPANY,                  )
ET AL.,                                 )
                                        )
                    Defendants.         )

## ORDER

Defendant has moved to exclude, on <u>Daubert</u> grounds,[1] the testimony of several of plaintiff's expert witnesses.  This order addresses the motions which have challenged the proffered testimony of Allan J. Kam [Doc. #67], Thomas J. Feaheny [Doc. #68] and Ben Parr [Doc. #69].  The motions have been briefed by both parties.[2]  Each proposed witness has been deposed and portions of that testimony have been attached to the parties' briefs. Further, each witness has submitted an expert report.   Two of the reports are relatively lengthy and detailed.  The other is accompanied by supplemental information from counsel. In these circumstances, the court concludes a hearing is unnecessary as to these motions.

The general standards for a <u>Daubert</u> challenge to expert testimony are well

---

[1] <u>Daubert v. Merrill Dow Pharm. Inc.</u>, 509 U.S. 579 (1993).  See also Fed.R.Evid. 702, which now substantially incorporates the principles of <u>Daubert</u>.

[2] The court's task has been made more difficult by plaintiff's occasional practice of adopting the statement or affidavit of an expert as her response to defendants' <u>Daubert</u> motions. The proper practice is for a party to reference pertinent portions of supporting documents in a brief, rather than relying on the court to read a document and determine which portions relate to particular issues.

established.  "In accord with [Rule 702], the Supreme Court has determined that the [trial judge] 'must ensure that any and all scientific testimony or evidence is not only relevant, but reliable.'"  Bitler v. A.O. Smith Corp., 400 F.3d 1227, 1232 (10th Cir. 2004) (quoting Daubert, 509 U.S. at 589).  This gatekeeper function applies to all expert testimony, not merely to that deemed to be "scientific" in nature.  Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137, 147-49 (1999).  Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In deciding the admissibility of expert testimony, the court must determine whether the expert is proposing to testify to scientific or other specialized knowledge which will assist the trier of fact in understanding or determining a fact in issue.  Daubert, 509 U.S. at 592.  The court first determines whether the proposed expert is qualified to offer an opinion on the issues involved in the particular case.  Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 969 (10th Cir. 2001).  A qualified expert must possess the necessary knowledge, skill, experience, training or education relevant to the facts at issue.  Id.  The court then must conduct a two-part inquiry to fulfill its Daubert gatekeeping role, determining first if the expert's proffered testimony has "'a reliable basis in the knowledge and experience of his [or her] discipline.'"  Bitler, 400 F.3d at 1232-33 (quoting Daubert, 509 U.S. at 592).  In making this determination, the district court must decide whether the reasoning or methodology

underlying the testimony is scientifically valid. *Id.* at 1233. Second, the district court must inquire "into whether proposed testimony is sufficiently 'relevant to the task at hand.'" *Id.* at 1234 (quoting Daubert, 509 U.S. at 597). Is there an appropriate "fit" between the evidence offered and the material issue to which it is directed?

In determining whether an expert's proffered testimony meets the Rule's reliability standards, Daubert and Rule 702 provide a non-exclusive list of factors for consideration, if applicable. As the 2000 Advisory Committee Notes to Rule 702 state:

> The specific factors explicated by the Daubert court are (1) whether the expert's technique or theory can be or has been tested — that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.

The Notes also identify a number of other factors which may, in a proper case, be relevant to the determination of whether expert testimony is sufficiently reliable. These include: (1) whether the expert proposes to testify about matters growing naturally and directly out of research he/she has conducted independent of the litigation, or whether the opinion was developed expressly for the purpose of testifying, (2) whether the expert has "unjustifiably extrapolated from an accepted premise to an unfounded conclusion," (3) whether the expert has adequately accounted for obvious alternative explanations, (4) whether the expert is being as careful in his/her litigation consulting work as he or she would be in their regular professional work, and (5) whether the particular field of expertise claimed by the expert is

one known to reach reliable results for the type of opinion sought to be given.  *Id.*

The court determines the relevance or "fit" of proposed testimony and also considers the related question of helpfulness to the jury.  Expert testimony is unnecessary where it addresses a question the jury is capable of assessing or determining for itself.  Thompson v. State Farm Fire & Cas. Co., 34 F.3d 932, 941 (10th Cir. 1994).  Further, the proposed testimony may not go to ultimate issues of law governing the jury's deliberations, as instructions on the law are the function of the court.  United States Aviation Underwriters, Inc. v. Pilatus Business Aircraft, Ltd., 582 F.3d 1131, 1150 (10th Cir. 2009); Specht v. Jensen, 853 F.2d 805, 808 (10th Cir. 1988).

The burden of demonstrating the admissibility of expert testimony, tested against the standards of Daubert and Rule 702, is on the proponent of the testimony.  U.S. v. Nachio, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc); Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 970 (10th Cir. 2001).

### Allan J. Kam

Allan J. Kam worked as an enforcement attorney for the National Highway Traffic Safety Administration ("NHTSA") until his retirement in 2000.  Although there is some uncertainty as to exactly what plaintiff intends to prove through the testimony of Mr. Kam,[3] it appears he should be viewed as an expert on the NHTSA administrative process.

_____

[3]*Mr. Kam, like Mr. Feahney and Mr. Parr, has considerable experience in testifying in cases of this sort.  Each witness submitted an expert report, the bulk of which appears to be largely pre-packaged and often used, without much tailoring to the facts and issues of this case, at least as of the time the expert report was submitted.  In some cases, plaintiff's description(s) of the witnesses expected testimony goes beyond the witness' summary of what his conclusions will be.*

Plaintiff initially sought to offer Mr. Kam as an expert on the NHTSA administrative process generally and on Federal Motor Vehicle Safety Standard ("FMVSS") 216, which relates to roof crush standards, in particular. Supplemental reports by Mr. Kam, in addition to updating his prior information, add information as to FMVSS 205 (standard for "glazing," i.e. window glass). Plaintiff offers Mr. Kam's testimony in at least these areas: (1) that Federal Motor Vehicle Safety Standards ("FMVSS") are only minimum standards which do not cover all aspects of a vehicle component's performance, (2) that compliance with the standards is not sufficient to protect the public from unreasonable risk of injury, (3) that compliance with FMVSSs applicable at the time of a vehicle's manufacture does not mean a vehicle is "safe" or that it is state of the art, (4) that NHTSA does not certify the safety of vehicles, (5) that NHTSA "has asked manufacturers to do more" than meet the minimum standards, (6) that FMVSS 216, which applies to roof crush resistance, has been found by NHTSA to have little or no effect in reducing fatalities in certain vehicles, (7) that some NHTSA officials have said FMVSS 216 needs to be upgraded, though an upgrade has not occurred, (8) that FMVSS 205 permits either laminated glass, glass plastic, or tempered glass for side windows, (9) that one of the purposes of FMVSS 205 is to minimize the chances of an occupant being ejected from the vehicle, (10) that the NHTSA was "moving toward" a revision of FMVSS 205 in the 1990's but changed direction after the 2000 election and change of administrations, (11) that, in 2005, Congress ordered the agency to initiate rulemaking on occupant ejection protection issues and to issue a final rule by 2009, but that no rule has been promulgated, and (12) that a NHTSA decision to close a defect investigation

does not constitute a finding of "no defect" or that the product is safe. Though not included in Mr. Kam's explicit listing of his conclusions, plaintiff's submissions and the contents of Mr. Kam's reports and deposition testimony make clear that he plans to testify to the inadequacy of FMVSS 205 and 216 from a safety standpoint, and that auto manufacturers have unduly influenced NHTSA's adoption of these and other standards.

The court first considers whether the proposed expert is qualified to offer the opinions or specialized information in question. As noted above, the court views Mr. Kam's area of expertise as being essentially the NHTSA administrative process. As an enforcement lawyer with that agency and a career with it spanning 25 years, he has substantial knowledge of and experience with the agency's enforcement actions, its rulemaking processes, and its administrative processes in general. He is not, however, an automotive safety engineer, an automotive design specialist, or other "subject matter" type specialist.[4] The court concludes that, to the extent expert testimony as to the NHTSA administrative process is otherwise permissible, Mr. Kam is qualified to give it.

A substantial portion of Mr. Kam's proffered testimony is, however, inadmissible on one or more grounds. His opinion that federal safety standards are "minimum" standards is a legal conclusion, as the briefs of both plaintiff and defendants make clear, and expert testimony as to that invades the province of the court to instruct the jury. His testimony as to the effect of the legal standards — that FMVSS does not certify vehicles as "safe" or that

---

[4]*Also, Mr. Kam was not personally involved in the rule-making proceedings for either FMVSS 205 or 216.*

compliance doesn't mean a vehicle is safe or state of the art — is similarly objectionable as involving legal conclusions and would essentially have the expert offering opinions that are, in substance, the arguments of counsel. *See* In re Rezulin Products Liab. Litigation, 309 F.Supp.2d 531, 541 (S.D.N.Y. 2004).

Mr. Kam's opinions as to the adequacy of FMVSS 205 or 216 will similarly be excluded.[5] His conclusion that the standards are insufficient to protect the public from unreasonable risk of injury might be admissible if he were someone with expertise in the particular subject matter, such as an automotive design engineer or safety specialist, but they are not matters he is qualified to opine on by reason of familiarity with the administrative process. Similarly, he will not be permitted to testify to substantive matters which are essentially just his marshaling of the opinions or expertise of others, such as items 6 and 7.

Much of Mr. Kam's testimony purports to show or suggest the inadequacy of the various standards due to political influence, industry lobbying and the like, rather than by reference to any objective safety or design standard.[6] He also argues the regulatory response is deficient in other ways.[7] The court concludes such testimony should be excluded. It has,

---

[5]*Mr. Kam's report and testimony include many critical references to the agency standards, suggesting the standards are "rather lenient," that the agency has a "checkered history" in dealing with certain standards, and the like.*

[6]*For example, Mr. Kam discusses at some length the impact of industry contacts with President Nixon and others during the Watergate era, almost forty years ago. Plaintiff's response brief assures that no such testimony will be elicited from Mr. Kam, but Mr. Kam apparently thought it important enough to devote four pages of his expert report to it.*

[7]*Mr. Kam's discussion of the nature of assuring compliance with the standards, i.e. that certification is done by the manufacturer rather than by agency personnel, appears to be somewhat*

at most, marginal relevance here and permitting testimony of that type has a high potential to turn this case into a trial of the adequacy of government regulation in general or a discussion of political influence and its evils, rather than focusing on the issues central to this case. Whatever influences may have impacted the regulatory standards at their adoption, decades ago in some cases, the standards in 1999 or today are what they are. That a government policy might be impacted by the political process in some way is both unremarkable and obvious to the jury — it doesn't need expert assistance to evaluate such a possibility. And to the extent Mr. Kam seeks to show the inadequacy of the standards by suggesting improper or wrongful conduct by the industry as the explanation for the current standards, it implicates the considerations underlying Fed.R.Evid. 403, which permits exclusion of even relevant testimony where confusion of the issues is likely.[8] The court concludes evidence of inadequacy of the various standards by reason of the process through which they were adopted will be excluded.[9]

---

*beside the point here, where plaintiff explicitly acknowledges defendants' compliance with FMVSS 216 (and perhaps 205).*

    [8]*It appears clear enough, both from Mr. Kam's testimony and that of plaintiff's other experts referenced in this order, that defendant, a relatively recent entrant into the U. S. market, did not participate in the formulation of the various standards anyway. These experts' efforts to show "linkage" or other contacts between this defendant and other auto manufacturers are tenuous enough that it reinforces the court's view of the application here of Rule 403.*

    [9]*Plaintiff relies on <u>Shipler v. General Motors Corp.</u>, 710 N.W.2d 807 (Neb. 2006), which affirmed the trial court's admission of testimony similar to Mr. Kam's, suggesting <u>Shipler</u> is "determinative on the issue" of whether such testimony is admissible. It is no such thing. Even if that court's decisions were otherwise binding on this court, an appellate court's conclusion that an admission of particular testimony is not an abuse of discretion "does not lend measurable support" to the suggestion that other courts cannot reach a contrary conclusion. <u>North American Specialty Ins. Co. v. Britt Paulk Ins. Agency, Inc.</u>, 579 F.3d 1106, 1112 (10th Cir. 2009).*

Plaintiff anticipates that defendant may allude to a 1992 denial by the NHTSA of a petition for rulemaking involving the inertial unlatching of seat belts. Mr. Kam would testify that, based on the standards and practices of the agency, the denial of such a petition does not constitute a finding by the agency that no defect exists or that the vehicle is "safe" as to the aspect of the vehicle evaluated. Similarly, he would testify that the absence of a directed "recall" does not suggest a finding of no defect. He bases those conclusions on the nature of the inquiry or other circumstances, the agency's resources, and a variety of other factors impacting a sort of "prosecutorial discretion." The court concludes such expert testimony, which goes to specialized matters of agency practice rather than being a tacit interpretation of legal standards, is permissible.[10]

In sum, Mr. Kam will be permitted to testify to NHTSA practice as referenced above and may explain NHTSA processes and terminology in general, if relevant to an issue in the case. He will not be permitted to put the agency or the standard "on trial," due to industry influence on the standard-setting process, or to otherwise testify to the adequacy or inadequacy of the standards to assure occupant safety.

Thomas J. Feaheny

---

[10]*Absent conduct by defendants opening the door on the subject, Mr. Kam will not be permitted to give his opinions as to why the agency may have denied the petition. For example, Mr. Kam suggests he would testify that, based on his understanding of the testimony of other witnesses in other cases, that tests were "rigged" or that pertinent information was withheld by certain auto manufacturers. Such testimony would implicate the Rule 403 concerns that undergird the court's limitation of Mr. Kam's "process" testimony referenced above, as well as other evidentiary issues.*

Thomas J. Feaheny is a longtime former executive with Ford Motor Company.[11]  His formal educational background is in mechanical engineering and business administration.  At Ford, he was involved in a variety of tasks, including supervision of vehicle engineering and safety compliance.  By the end of his tenure with Ford, he was Vice-President of Car Engineering and finally Vice President of Vehicle Research.  Since leaving Ford in l983, he has been a consultant and expert witness, principally for plaintiffs asserting claims against Ford and General Motors.  He does not view himself as a glass specialist as such, but indicates a particular interest in glass and glazing issues.  He had responsibility, while at Ford, for many vehicle design decisions relating to particular components (including glazing) and their relationship to the vehicle as a whole.

As with Mr. Kam, it is somewhat difficult to pin down the nature of the opinions plaintiff seeks to offer through Mr. Feaheny.  His expert report and related submissions suggest he may seek to testify to more than just the explicit conclusions identified in the conclusion of his expert report.[12]  The explicit conclusions he has identified (expert report, pp. 11-12) are essentially these: (1) that Hyundai has known since 1970 that the use of tempered glass (as opposed to laminated, plastic, or glass-plastic) substantially increased the possibility of occupant ejection in an accident, (2) that there were no legal, technological or other barriers preventing Hyundai from using laminated glass in the 1999 Sonata, (3) that use

---

[11]*He worked for General Motors for four years in the early years of his career and was then with Ford from 1957 to 1983.*

[12]*The report is attached to defendants' Daubert motion [Doc. #68] as exhibit 1.  The report was supplemented by an affidavit of Mr. Feaheny attached to (and which in effect became) plaintiff's response brief [Doc. #80, exhibit 1].*

of laminated glass in the side window of the 1999 Sonata involved here would have prevented plaintiff's ejection from the vehicle and contact with the ground, (4) the only reason Hyundai didn't use laminated glass was to save money, (5) Hyundai's decision "to save money at the expense of innocent human life and pain and suffering" constituted "callous disregard of their duty to motor safety," and that this failure to act was "enhanced" by similar acts of their competitors; it is "shameful and shocking" that such a "large, powerful and influential industry" has "for years conspired" to resist opportunities to improve vehicle safety through improved glazing, (6) Hyundai's failure as to glazing is enhanced by "the other defects obvious in this accident" involving roof crush and seat belts, (7) the indicated design deficiencies (i.e. the glass issues) constitute defects rendering the vehicle unreasonably dangerous beyond the contemplation of the average consumer, (8) Hyundai's design and other conduct evidence "reckless disregard and conscious indifference" to the lives and safety of others, and (9) that all of the above opinions are true "to a reasonable degree of engineering certainty."[13]

Although not part of his explicit summary conclusions, Mr. Feaheny's report suggests he also has the following opinions: (10) that plaintiff was ejected from the driver's side window of the subject vehicle, (11) that plaintiff's injuries were probably inflicted inside the vehicle due to roof crush, (12) it is "possible" her injuries resulted from ejection through the window, (13) the auto industry has done nothing since 1970 to address preventing occupant

---

[13]*The numbering of Mr. Feaheny's opinions is different here from that in his report. The report omits any conclusions actually numbered 6 or 7, suggesting the somewhat "cut and paste" nature of his report.*

ejection, relying instead on "irrelevant sophistry" that they had complied with federal standards, (14) that NHTSA tried, in this "unfortunate technological leadership vacuum," to encourage improvements in glazing/ejection, (15) that NHTSA "hoped" the manufacturers would "accept the challenge," and (16) that NHTSA conducted a meeting on the issue in 1996, at which the industry's answer to proffered data was "totally non-responsive." His affidavit provides additional explanation of the things he relied on to arrive at some of these conclusions, including his reliance on the work of other experts in this case.

The court concludes that Mr. Feaheny has a sufficient background to qualify him to give at least some testimony in this case. Although he is not a glass specialist in the sense of having that engineering or production specialty, he does have formal training in engineering in general and has substantial experience with the design alternatives confronting automobile manufacturers as to glass and other glazing materials. Such qualifications provide the necessary predicate for some, but not all, of the testimony he seeks to offer.

Mr. Feaheny is not an accident reconstructionist nor does he claim expertise or training in occupant kinematics. As a result, he lacks the qualifications to give opinions like those numbered 3, 10, 11, and 12 above. It does not resolve the problem for him to say that he relied on other experts for those conclusions. Where he brings no additional or other expertise to bear on the issue, there is no basis for him simply repeating the conclusions of others as his own. *See* TK-7 Corp. v. Est. of Barbouti, 993 F.2d 722, 732-33 (10th Cir. 1993) (expert's testimony relying on another expert's report excluded where the testifying expert

showed no familiarity with the methods and reasons underlying the report).[14]

As to the remaining opinions or testimony of Mr. Feaheny, most must be excluded for reasons grounded in other <u>Daubert</u>/Rule 702 considerations. He admitted in his deposition testimony that he had no basis for any opinion as to what Hyundai knew or didn't know in 1970. He admitted he knew of no evidence that Hyundai's decisions as to side window material were based on cost, nor did he have knowledge of Hyundai's cost structure generally. Accordingly, he had no basis for opinions like 4 and 5 above. *See also* <u>In re Rezulin Products Liability Litigation</u>, 309 F.Supp.2d at 546 (excluding expert testimony as to corporate motivation and intent as not based on any relevant body of knowledge or expertise and as assuming the role of advocate).

Mr. Feaheny's conclusions as to "callous disregard," "shameful and shocking" conduct, "reckless disregard" and the like must be excluded as lacking a sufficient foundation in the materials he has identified, drawing conclusions the jury is capable of drawing for itself if otherwise warranted, and assuming the role of an advocate rather than expert. Further, his opinions based on the industry "conspiring" to avoid safety improvements and the like will be excluded for the same reasons (largely, but not exclusively, Fed.R.Evid. 403) as were the basis for the court's exclusion of similar testimony by Mr. Kam. His opinions that defendants' misconduct is "enhanced" by other "defects" in the Sonata must also be

---

[14]*Mr. Feaheny did not inspect the Sonata involved here and did no testing related to any of his conclusions. Indeed, at least as of the time of his deposition, he wasn't sure the Hyundai Sonata involved in this case even used tempered glass in the side windows; his affidavit reveals subsequent efforts to satisfy himself in that regard.*

excluded, as any determination of <u>other</u> defects is outside Mr. Feaheny's demonstrated area of expertise.

The court concludes that, after stripping Mr. Feaheny's opinions of their partisan rhetoric and applying <u>Daubert</u>/Rule 702 standards,[15] his testimony will be limited to two basic areas. First, he may testify that, in his opinion, the design of the Sonata was defective by reason of its use of tempered glass.[16] Second, he may testify that there were no technological or other barriers to the use of laminated glass in side windows in 1999. Both such opinions are within Mr. Feaheny's expertise, based on his training and his experience with vehicle design while at Ford, and are based on sufficient grounds to warrant admission under Rule 702.

### Ben Parr

Ben Parr was formerly a corporate executive with General Motors, with responsibilities in the engineering area. He was employed by that company from 1957 to 1980. From 1981 through 1998, he was employed by State Farm Insurance, with responsibilities for studying auto accident claim data and providing State Farm with advice as to automotive design and safety features.

---

[15]*The partisan nature of his testimony is illustrated by his reckless assertion that all of his opinions are true "to a reasonable degree of engineering certainty." See opinion numbered 9 above. Most of his proffered opinions have nothing to do with engineering principles.*

[16]*The testimony may not include the further conclusion that the claimed defect rendered the vehicle "unreasonably dangerous beyond the contemplation of the average consumer." The conclusion is an ultimate legal conclusion which an expert may not draw, as it invades the province of the court and jury. <u>United States Aviation Underwriters, Inc.</u>, supra. Moreover, there is no indication Mr. Feaheny's expertise extends to consumer expectations in this area.*

As with Mr. Kam and Mr. Feaheny, the opinions to be offered by Mr. Parr are a bit of a moving target. His expert report, dated January 19, 2007, is largely a pre-packaged product with little effort to tailor it to the facts of this case.[17] Detail as to <u>this</u> case is supplied largely through a cover letter from plaintiff's counsel,[18] which summarizes some of Mr. Parr's conclusions and adds others not referenced in Mr. Parr's report.[19]

In general, plaintiff offers Mr. Parr as an expert on the adequacy of FMVSS 216, the roof crush standard. Distilling Mr. Parr's report and counsel's summary of intended testimony, it appears Mr. Parr would testify to these matters: (1) that FMVSS 216 is an inadequate standard, in that the testing contemplated by it does not assure adequate space for an occupant to survive in a rollover accident, (2) that the standard was based on auto industry recommendations, and that the industry sought an unreasonably lenient standard and resisted efforts to strengthen it, (3) that a proper standard would include certain additional or different tests, (4) that a properly packaged occupant, i.e. an occupant in vehicle with a properly designed roof and resulting passenger compartment protection, would likely survive a

---

[17]*At one point, the report states Mr. Parr lacks even "second hand" knowledge of any "direct collusion, conspiring, or any joint team cooperation in safety programs between Ford & GM...", suggesting Mr. Parr's usual focus is on defendants other than Hyundai. The only aspect of the report focused on Hyundai is a statement it would have been "beneficial" to have information as to Hyundai's testing procedures, so that he could figure out various other things about Hyundai. He apparently did not have access to the identified information.*

[18]*Exhibit 1 to defendants' motion [Doc. #69] includes both the letter and the expert report.*

[19]*The manner of describing what are apparently Mr. Parr's opinions, the nature of those opinions, and various surrounding circumstances, make it clear that his opinions, like those of Mr. Kam and Mr. Feaheny, are ones "formed expressly for purposes of testifying" and are hence subject to close scrutiny for that reason. See Comment to 2000 Amendments to Rule 702, citing <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 43 F.3d 1311, 1317 (9th Cir. 1995).*

rollover crash whether belted or not, (5) that auto manufacturers, including foreign ones,

knew the importance of meaningful roof crush protection in protecting occupants and knew

that the roof crush standard was inadequate, (6) that meaningful roof protection was

technologically feasible and had been available for many years,[20] (7) that there was

"linkage" between Hyundai and other manufacturers, which gave it access to what they knew

about roof crush issues and other matters, and that their knowledge of the inadequacy of the

standard should be imputed to Hyundai, and (8) that a report titled "Deadly by Design" is an

"excellent compendium of events and correspondence of the Automotive Safety Committee

as it has labored since the 1960's" as to roof structure issues and that he can testify to the

accuracy and content of it.[21] Plaintiff indicates Mr. Parr intends to offer his testimony

through a Power Point presentation.[22]

As noted above, Mr. Parr has a professional background in various aspects of vehicle

design and safety, at least as a corporate executive.[23] The extent of his claimed expertise as

applicable to this case is, however, unclear. In his July, 2007, deposition, Mr. Parr made it

---

[20]*Although Mr. Parr's report makes no mention of the cost savings to Hyundai or others from the roof structure it employed, counsel's summary suggests he would testify to a $60 per car saving. Mr. Parr's deposition testimony (at p. 21) indicates that the number is $40 per car, based on a "compendium of estimates..." rather than any analysis of Hyundai's circumstances by him.*

[21]*The report does not identify the professional background of its authors. Defendants assert the authors are lawyers who customarily represent plaintiffs in cases against automobile companies.*

[22]*The court does not view the matter of "Power Point presentation" versus customary testimony as having an impact on the present motion.*

[23]*Mr. Parr's formal educational training is as a mechanical engineer and he was a product engineer in the early portion of his career. His responsibilities appear to have shifted into policy issues and corporate supervisory functions as his career progressed.*

explicitly clear he was not seeking to testify in this case as a roof design expert.[24]  Rather, he appeared to be planning to testify from a perspective somewhat like that of Mr. Kam, as an industry or process observer, or as a sort of summary expert for the things that other experts knew or asserted.  By the date of his supplemental affidavit in July, 2009,[25] perhaps recognizing the limitations of that perspective, he shifted to emphasize his experience as an automotive engineer and his "extensive experience relating to roof design and testing of auto roofs..." as a basis for his conclusion that FMVSS 216 is inadequate.  The affidavit adds additional detail as to his view that the industry manipulated the standard setting process.  It also adds his view that Hyundai should have known of the deficiencies in FMVSS 216, not through the rather vague "linkage" referenced in his expert report, but based on the application of "recognized and accepted design engineering principles...."[26]

The court concludes Mr. Parr's effort to re-position himself and his expert conclusions should not be permitted.  The expert report required by Fed.R.Civ.P. 26(a)(2)(B) must include a "complete statement of the opinions the witness will express and the basis and reasons for them."  Further, the report must contain "the data or other information considered by the witness in forming them."  The purpose of the rule is evaded if a party or proposed expert is permitted to file an expert report (and testify, here via deposition) based on one approach or set of assumptions and then shift to a different basis or approach as the case

[24]*Parr deposition, p. 39, exhibit 3 to defendants' motion [Doc. #69].*

[25]*Exhibit 1 to plaintiff's response brief [Doc. #84].*

[26]*He does not identify or otherwise explain the principle or standard he relies on for his conclusion.*

progresses or as problems are encountered. No justification for such a shift is apparent here and the court concludes Mr. Parr's proposed testimony must be evaluated based on his own initial description of the expertise he brings to bear in this case.

Viewing Mr. Parr as something other than a "roof design expert," the question becomes whether there is a basis for his proposed testimony based on his knowledge of the industry generally or of the views of other experts. As noted above in connection with the discussion of Mr. Kam, the considerations underlying Rule 403 warrant the exclusion of Mr. Parr's testimony insofar as he bases his conclusions about the adequacy of FMVSS 216 on industry involvement in the standard setting process. The issues in this case involve the adequacy of the design of the 1999 Sonata and defendants' actions as to that. There is a substantial risk of confusing those issues if this case is permitted to turn into an argument over the conduct and actions of the automotive industry, most of which do not even arguably involve Hyundai, over the past 40 years. Most of the opinions Mr. Parr seeks to offer must be excluded on this basis.

To the extent that Mr. Parr seeks merely to summarize the opinions of other experts, the court concludes that testimony must similarly be excluded as well. As noted above in connection with Mr. Feaheny's proposed testimony, an expert witness may not simply repeat the conclusions of other experts as his own without bringing his own expertise to bear in some fashion.[27] And here, as noted, Mr. Parr is not bringing his engineering expertise to bear

---

[27]*Fed.R.Evid. 703 permits an expert to rely on "facts or data" which is of a type "reasonably relied upon by experts in the particular field...." Plaintiff's response does not address the qualifications of the "Deadly by Design" authors, or the background of that document, and it is at*

on the various substantive conclusions because he is not testifying as a design expert.

Taken together, the indicated considerations render Mr. Parr's proposed testimony inadmissible. Therefore, his testimony will be excluded in its entirety.

Conclusion

For the reasons and to the extent stated above, defendant's motions to exclude the testimony of Allan J. Kam [Doc. #67] and Thomas J. Feaheny [Doc. #68] are **GRANTED IN PART** and **DENIED IN PART**. The motion to exclude the testimony of Ben Parr [Doc. #69] is **GRANTED**.

**IT IS SO ORDERED**.

Dated this 14th day of January, 2010.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE

---

least questionable whether Mr. Parr or any expert could reasonably rely on the facts or data in that report as the basis for further opinions.